UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

TOSHI EDWARD WILLINGHAM,

        Petitioner,

v.

CATHERINE BAUMAN,

        Respondent.

_____/

Case No. 2:19-cv-221

Honorable Paul L. Maloney

## <u>OPINION</u>

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

<u>**Discussion**</u>

## I.    Factual allegations

Petitioner Toshi Edward Willingham is incarcerated with the Michigan Department of Corrections at the Alger Correctional Facility (LMF) in Alger County, Michigan. Following a two-day jury trial in the Berrien County Circuit Court, Petitioner was convicted of assault with intent to murder (AWIM), in violation of Mich. Comp. Laws § 750.83, and possession of a firearm during the commission of a felony (felony firearm), in violation of Mich. Comp. Laws § 750.227b. On December 8, 2015, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to a prison term of 30 to 90 years for AWIM, to be served consecutively to a prison term of 2 years for felony firearm.

On October 31, 2019, Petitioner timely filed his habeas corpus petition raising five grounds for relief, as follows:

I.     Petitioner's Fifth and Fourteenth Amendment rights to due process of law were violated because the evidence was insufficient to convict him of the crimes charged.

II.    The trial court committed an error of law and abused its discretion by admitting evidence of a 911 call and interview with Ashley Davis because (1) the evidence was not admissible under Mich. Comp. Laws § 768.27(c) and (2) admission of the evidence violated Petitioner's right of confrontation and his right to a fair trial by the admission of testimonial hearsay in violation of the Fifth, Sixth, and Fourteenth Amendments.

III.   The trial court erred with regard to the scoring of OV-6; alternatively, counsel was ineffective for failing to object in violation of the Sixth and Fourteenth Amendments.

IV.    Petitioner was improperly sentenced as a fourth habitual offender where the prosecutor failed to properly specify the alleged convictions, any possible convictions were either misdemeanors or pleas where Petitioner was not represented by counsel and in the alternative, Petitioner's counsel was ineffective for failing to object; in violation of the Sixth and Fourteenth Amendments.

V.      Petitioner was denied his due process right to a fair trial where the trial court allowed the admittance of a firearm as an exhibit that was not found in the possession or vicinity of Petitioner and in the alternative counsel was ineffective for failing to object or file a motion for the suppression of the highly prejudicial evidence; in violation of the Fifth, Sixth, and Fourteenth Amendments.

(Pet., ECF No. 1-1, PageID.16-44.)

Petitioner's convictions stem from an incident on May 11, 2015. The Michigan Court of Appeals described the incident, and the evidence admitted at Petitioner's trial, as follows:

On May 11, 2015, Ashley Davis went to J&B's Liquor Store (J&B's) with Demetrious Howard and Kashmir Zahoui. Davis spoke with her cousin, Angela Hemphill, in J&B's parking lot. While Davis and Hemphill were talking, Zahoui told Davis that defendant, whom Davis had dated in the past, was behind her. Davis wanted to avoid defendant because she had fought with defendant's sister a few days before. She returned to Howard's car, but defendant confronted her before she could leave.

Hemphill testified that an argument between defendant and Davis ensued and that as Howard began driving away, Davis called defendant or his sister a "bitch," and in response defendant took out a firearm and started shooting at Howard's car as it drove away. Because Davis was unavailable for trial, Benton Harbor Public Safety Department Officer Benjamin Ingersoll testified to Davis's account of the events as relayed to him during an interview conducted shortly after the shooting. According to Ingersoll, Davis indicated that she and Howard were leaving J&B's parking lot when defendant pulled out a gun and started shooting at Howard's car.

Howard was also unavailable for trial, but a recording of his preliminary examination testimony was played for the jury. Howard testified that defendant was not the man who had shot at his car. Rather, the man who had shot at the car later approached Howard, identified himself as "Boo Man," apologized, and offered to pay for damages to the vehicle. Ingersoll testified, to the contrary, that when he interviewed Howard about the shooting, Howard stated that an unnamed person had come up to his car before the shooting and said to him, "Drive off, I'm gonna shoot," at which point Howard drove from the parking lot and the person shot at Howard's car. Ingersoll also testified that Howard never mentioned a person named "Boo Man" at any point after the shooting.

Davis called 911 from Howard's car. A recording of the 911 call was played for the jury. In the call, Davis stated that defendant had shot at her and that she was not going back to J&B's because she did not think that it was safe. Ingersoll met Davis at her home while another officer went to J&B's to secure the scene. At Davis's home, Ingersoll interviewed Davis and Hemphill, and recorded those interviews with his body camera. Recordings of those interviews were played for

3

the jury.  Ingersoll also investigated Howard's car at Davis's home and confirmed that four bullets had impacted the car.

The officer who responded to J&B's canvassed the parking lot and found seven shell casings.  Ingersoll also canvassed J&B's at a later time and found an eighth shell casing.  The shell casings were sent to the Michigan State Police (MSP) for analysis.  An expert in firearm examinations testified that the casings were from nine-millimeter luger rounds that required a nine-millimeter caliber luger firearm to fire.

In an unrelated investigation, Benton Township Police Department Detective Brian Smit found a gun during a search of the residence where a Daniel Autry was staying. Shortly before the gun was found, defendant's brother, Kayjuan Spears, was seen leaving the home.  The gun was sent to the MSP for analysis.  An expert in firearm examinations testified that the gun was a nine-millimeter caliber luger firearm capable of firing the ammunition from the casings that were recovered at J&B's. The expert further concluded, based on his examination of four of the eight casings, that the ammunition was fired from the firearm that had been recovered by Smit. The results of the examination of the other four casings were inconclusive.

Defendant was subsequently interviewed by MSP Detective Sergeant Michael Logan.  According to Logan, defendant originally told him that he had purchased the gun for $150 from a man nicknamed "Little Joe" and that he had sold the gun to Autry for $300 in May 2015.  However, in a subsequent interview, defendant said that those statements were not true and that he had made them up to protect his brother, whom he knew was under investigation.  Defendant stated that the only time he had handled the gun was when his brother handed it to him and he posed for a picture with it. That picture was entered into evidence at defendant's trial.

(Mich. Ct. App. Op., ECF No. 1-6, PageID.102-103.)

Before trial, the prosecution moved to admit the recordings of Ashley Davis's 911 call and her interview with the police under Mich. Comp. Laws § 768.27c.  That statute permits the admission of a statement by a declarant if the following apply:

(a) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

(b) The action in which the evidence is offered under this section is an offense involving domestic violence.

(c) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of a statement made more than 5 years before the filing of the current action or proceeding is inadmissible under this section.

(d) The statement was made under circumstances that would indicate the statement's trustworthiness.

(e) The statement was made to a law enforcement officer.

Mich. Comp. Laws § 768.27c(1). The statute defines domestic violence to include "causing or attempting to cause physical or mental harm to a . . . household member . . . [and p]lacing a . . . household member in fear of physical or mental harm." Mich. Comp. Laws § 768.27c(5)(b). The definition of household member, in turn, includes "[a]n individual with whom the person has or has had a dating relationship." Mich. Comp. Laws § 768.27c(5)(c)(iv). Davis and Petitioner had dated.

Petitioner objected arguing that Davis's statements did not meet any hearsay exception, were not admissible under the cited statute, and, even if admissible, would violate Petitioner's Confrontation Clause rights. The court heard argument on the prosecutor's motion and concluded that the statements were admissible under the statute. In addition, the court determined the statements would have been admissible under the Michigan Rules of Evidence as excited utterances and present sense impressions. Finally, the court determined that admission of Davis's statements did not violate the Confrontation Clause because they were not testimonial; instead, they were made to assist the police in addressing an ongoing emergency. (Pet., ECF No. 1-1, PageID.26-28.)

At sentencing, Petitioner objected to several errors in the presentence investigation report (PSIR). Most significantly, Petitioner contended that he could not be sentenced as a fourth habitual offender because an Illinois conviction for "resisting and obstructing" was a misdemeanor and because a predicate offense of marijuana possession relied upon by the prosecutor simply did not exist. The court concluded that the "resisting and obstructing" offense would be considered a felony in Michigan and, therefore, counted as a predicate felony for habitual offender status. The

court never ruled on Petitioner's other objections and, when the court asked counsel whether he had any other additions or deletions to the PSIR, counsel told the court all concerns had been addressed.

Petitioner directly appealed his convictions to the Michigan Court of Appeals. In a brief filed with the assistance of counsel, Petitioner raised the first four habeas issues identified above. In a supplemental *pro per* brief, Petitioner raised his fifth habeas issue. By unpublished opinion issued August 15, 2017, the court of appeals affirmed the trial court.

Petitioner then filed a *pro per* application for leave to appeal in the Michigan Supreme Court raising the same five issues he raises in his petition. By order entered September 12, 2018, the supreme court denied leave. (Mich. Order, ECF No. 1-7, PageID.114.) Petitioner did not file a petition for certiorari in the United States Supreme Court. (Pet., ECF No. 1, PageID.3.) Instead, Petitioner filed the instant petition.

## II. AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

6

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 574 U.S. 1, 4 (2014); *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013); *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012); *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III. Discussion

#### A. Admission of the out-of-court statements of Ashley Davis (habeas issue II)

Petitioner objects to the admission of Ashley Davis's out-of-court statements. He contends, first, that the trial court got it wrong—the statements were not admissible under Mich. Comp. Laws § 768.27c or as exceptions to the hearsay rule under the Michigan Rules of Evidence. The court of appeals upheld the admission of Davis's statements under the statute and then concluded that, even if the statements did not meet the requirements of the hearsay exceptions in the rules, the statutory admissibility of the statements would render that error harmless.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law

questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. Therefore, Petitioner's claims that the state courts erred in admitting the evidence by misapplying the state statute or the state rules of evidence is not cognizable on habeas review.

Moreover, state-court evidentiary rulings cannot become cognizable—they cannot rise to the level of due process violations—unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

Petitioner attempts to bring the allegedly improper admission of Ms. Davis's out-of-court statements into the bounds of habeas cognizability by arguing that the admission of the statements rendered his trial fundamentally unfair, in violation of his due process rights, and violated his right to confront Ms. Davis as a witness against him. Petitioner's contention regarding the due process implications of admitting hearsay evidence fails. "The first and most conspicuous failing in [the petitioner's] petition is the absence of a Supreme Court holding granting relief on

his due process theory: that the admission of allegedly unreliable hearsay testimony violates the Due Process Clause. That by itself makes it difficult to conclude that the state court of appeals' decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Desai v. Boo*ker, 732 F.3d 628, 630 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)). Petitioner, therefore, has failed to demonstrate that the Michigan Court of Appeals' determination of his claim regarding the admissibility of Davis's out-of-court statements is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to habeas relief.

Petitioner's claim that he was denied the right to confront Ms. Davis also fails. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

The court of appeals expressly relied on *Crawford* and *Michigan v. Bryant*, 562 U.S. 344 (2011), and *Davis v. Washington*, 547 U.S. 813 (2006), in determining whether Petitioner's confrontation rights were violated by the admission of Ashley Davis's 911 call and interview. (Mich. Ct. App. Op., ECF No. 1-6, PageID.109-110.) *Crawford* emphasized that out-of-court statements raised confrontation concerns only if the statements were testimonial.

However, *Crawford* "[left] for another day any effort to spell out a comprehensive definition of 'testimonial'" *Crawford*, 541 U.S. at 68.

The United States Supreme Court picked up the task of defining which statements are testimonial, particularly with regard to statements to police, in *Davis* and *Bryant*. In *Davis*, the court held:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822 (footnote omitted). The *Davis* decision resolved two cases: *Davis v. Washington* and *Hammon v. Indiana*. In both cases, the criminal conduct was domestic violence. In appellant Davis's case, the prosecutor attempted to introduce into evidence the victim's statements from a call with the 911 emergency operator. In appellant Hammon's case, the prosecutor sought to introduce an affidavit filled out by the victim at the request of police when they responded to a domestic violence call. When police responded to the domestic violence call in Hammon's case, there was no emergency in progress. The Supreme Court characterized the officer's questioning of the victim and the completion of the affidavit as determining "what had happened" as opposed to "what is happening." *Id*. at 830. The *Davis* court concluded that the call between the 911 emergency operator and victim Michelle McCottry was not testimonial; but, the interview and the affidavit in the Hammon's case were testimonial.

In *Bryant*, the Supreme Court provided additional guidance to assist in drawing the line between testimonial and nontestimonial statements to police officers as they respond to emergency calls. The *Bryant* Court determined that the inquiry into whether the primary purpose of an interrogation is to enable police assistance to meet an ongoing emergency depends on an

objective evaluation of the circumstances in which the encounter occurs and the statements and actions of the parties. *Byrant*, 562 U.S. at 359. The Court explained:

> As we suggested in *Davis*, when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. As the context of this case brings into sharp relief, the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.

*Id*. at 370-71 (footnote omitted). Among the circumstances the *Bryant* Court considered were the intentions of the police, whether a gun was involved, and whether the assailant had been located or captured.

The inquiry of the court of appeals into the circumstances surrounding the 911 call and the subsequent interview of Ashley Davis, follows precisely the analytical path laid out in *Crawford*, *Davis*, and *Bryant*:

> Defendant additionally argues that the admission of the 911 call and Davis's interview with Ingersoll violated his right of confrontation. We disagree. Whether the admission of evidence "violate[s] a defendant's Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo." *People v. Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012).

> The protections of the Confrontation Clause apply "only to statements used as substantive evidence." *People v. Fackelman*, 489 Mich 515, 525; 802 NW2d 552 (2011). "In particular, one of the core protections of the Confrontation Clause concerns hearsay evidence that is 'testimonial' in nature." *Nunley*, 491 Mich at 697-698, citing *Crawford v. Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Statements "are testimonial when the circumstances objectively indicate that there is no [ ] ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 US at 822. In contrast, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id*. "To determine

whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, [reviewing courts] objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Michigan v. Bryant*, 562 US 344, 359; 131 S Ct 1143; 179 L Ed 2d 93 (2011) (citation omitted).

In this case, Davis's 911 call was clearly made with the primary purpose of assisting in an ongoing emergency. Davis called to inform the police of the shooting. Davis made the call immediately after the shooting occurred. Davis's call appeared to be "a call for help against a bona fide physical threat" as opposed to "a narrative report of a crime absent any imminent danger," which supports finding that the call was made to address an ongoing emergency. *Davis*, 547 US at 827. Moreover, Davis was so agitated by the events that the trial court, in listening to the 911 recording, had difficulty understanding her at times, tending to show that the statements were made "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id*. at 827. Consequently, Davis's 911 call was not admitted in violation of the Confrontation Clause because the primary purpose of the call was to objectively seek "to enable police assistance to meet an ongoing emergency." *Id*. at 828.

Similarly, the admission of Davis's statements to Ingersoll did not violate the Confrontation Clause. When Ingersoll responded to Davis's residence, all he knew was that there were shots fired near J&B's. When he questioned Davis, she told him that defendant had shot at her, but she did not say why defendant had done so. Ingersoll's subsequent questioning of Davis was objectively necessary to address an ongoing emergency. See *Bryant*, 562 U.S. at 360. Ingersoll was aware that defendant was still at large and had a gun, see *id*. at 364 (stating that "the duration and scope of an emergency may depend in part on the type of weapon employed"), but was uncertain of defendant's motivation for shooting at Davis and whether this was an isolated incident, see *id*. at 372 (stating that it was significant in that the police were unsure of whether "the cause of the shooting was a purely private dispute or that the threat from the shooter had ended" in determining whether there was an ongoing emergency). Ingersoll was therefore confronted with an ongoing emergency because he was uncertain whether defendant posed an ongoing risk to the public. See *id*. at 370-371 (stating that "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public."). Defendant's location was unknown when Ingersoll questioned Davis. See *id*. at 374 (stating that a finding of an ongoing emergency is supported if the threat's location remained unknown). Accordingly, Ingersoll's questions to Davis were "the exact type of questions necessary to allow the police to '"assess the situation, the threat to their own safety, and possible danger to the potential victim"' and to the public," *id*. at 376 (quoting Davis, 547 U.S. at 832), and did not violate defendant's right of confrontation.

(Mich. Ct. App. Op., ECF No. 1-6, PageID.109-110.)

In the petition, Petitioner responds to the state court's analysis. He reviews the circumstances of the 911 call and the interview and reaches a different conclusion:

> Ms. Davis made the 911 call as she was on her way home in a car and the shooter was on foot. There was no present emergency. The interview with Ingersoll occurred over a mile from the scene. Ingersoll testified that he did not feel he was in danger. Davis's demeanor during the interview also revealed that it did not appear that she believed there was an ongoing emergency. Perhaps most telling of Ms. Davis' testimonial intent can be found in Petitioner's counsel noting with Ingersoll that during the police body cam video interview with Angela Hemphill held within minutes of Ingersoll's interview with Ms. Davis and admitted at trial; Ashley Davis yelled out several times "Toshi Edward Willingham." (TR I at 97-101). The news of an unrelated shooting had no bearing on whether there was an ongoing emergency in this matter. The nature of the interview made it clear that the conversation was geared toward a subsequent prosecution. The trial judge mentions that there were bullet holes in the car. Petitioner submits that this information was not gleaned until after the interview and is irrelevant to a determination of whether there was an emergency situation.

(Pet., ECF No. 1-1, PageID.31-32.) Essentially, Petitioner asks this Court to independently decide whether the objective circumstances surrounding the 911 call and the interview support the determination that the statements are not testimonial. Even if this Court agreed with Petitioner's analysis of the circumstances, however, it could not grant relief. This Court must defer to the state court's decision unless the state court's factual determinations are unreasonable or its decision is contrary to, or an unreasonable application of, clearly established federal law.

Although Petitioner would prefer that the testimonial/nontestimonial determination were based on facts other than the facts upon which the court of appeals relied—facts that favor his position—he does not contest the reasonableness of the court of appeals' factual determinations. Moreover, Petitioner has not shown, and quite frankly cannot show, that the court of appeals' legal determinations are contrary to, or unreasonable applications of, *Crawford*, *Davis*, and *Bryant*, the clearly established federal law on this issue. Indeed, the court of appeals made its legal determinations because the circumstances surrounding Ms. Davis's 911 call are a lot like the circumstances surrounding the 911 call of Michell McCottry in *Davis*, and the circumstances

surrounding Ms. Davis's interview are a lot like the circumstances surrounding the police interview with the victim in *Bryant*. Petitioner, therefore, has failed to meet his burden with respect to this issue and he is not entitled to habeas relief.

### B.    Sufficiency of the evidence (habeas issue I)

Petitioner contests whether there was sufficient evidence to convict him of AWIM. Specifically, Petitioner argues that the evidence of his intent to murder was insufficient:

> Recognizing that Mr. Willingham denied that he was the shooter, the evidence at trial was insufficient to support an inference that he had the specific intent to murder. Officer Ingersoll stated that Demetrius Howard told him that the shooter said "Drive off, I'm gonna shoot!" They drove off and his vehicle was hit by numerous bullets. (TR 2 at 36 ). The only rational inference from the evidence presented was that, at most, Mr. Willingham intended to scare Ms. Davis. It is doubtful that the evidence even supported a conviction for assault with intent to do great bodily harm less than murder. The evidence certainly did not support the conviction for assault with intent to commit murder. The conviction must be vacated.

(Pet'r's Appeal Br., ECF No. 1-2, PageID.62.)

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2008) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied the following standard when it rejected Petitioner's sufficiency challenge:

> "Challenges to the sufficiency of the evidence are reviewed de novo." *People v. Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v. Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (citation and quotation marks omitted).

(Mich. Ct. App. Op., ECF No. 1-6, PageID.104.) Although the court of appeals relied on state authorities, the standard it applied is identical to the *Jackson* standard.

The court of appeals then, as *Jackson* commands, reviewed the evidence against the elements of the crime in a light that favored the prosecutor:

> "The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v. Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010) (citation and quotation marks omitted). In this case, defendant challenges the sufficiency of the evidence showing his actual intent to kill. "[A]n intent to kill for purposes of [AWIM] may not be proven by an intent to inflict great bodily harm or a wanton and wilful disregard of the likelihood that the natural tendency of the acts will likely

cause death or great bodily harm." *People v. Brown*, 267 Mich App 141, 150; 703 NW2d 230 (2005) (citation and quotation marks omitted). But a "[d]efendant's intent [can] be inferred from any facts in evidence," *Ericksen*, 288 Mich App at 196, including "the use of a deadly weapon," *People v. Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014), as well as

> the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made. [Brown, 267 Mich. App. at 149 n 5 (citations and quotation marks omitted).]

"Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill." *People v. Unger*, 278 Mich App 210, 231; 749 NW2d 272 (2008).

In this case, evidence was presented that Davis had attempted to avoid a confrontation with defendant. Before Davis could leave the area, however, defendant confronted her, pulled out a handgun (a dangerous weapon, see *Henderson*, 306 Mich App at 11), and discharged the weapon in Davis's direction. Defendant thus used "an instrument and means" that were "naturally adapted to produce death." *Brown*, 267 Mich App at 149 n 5. Defendant fired eight times, hitting the vehicle multiple times, which supports the inference that he intended to kill someone in the car. *Id*. Testimony from several witnesses supports the conclusion that Davis had had a serious fight with defendant's sister in the days before the shooting and that defendant's actions in approaching Davis may have been motivated by his ill will towards her. See *Brown*, 267 Mich App at 149 n 5. Viewing this evidence in the light most favorable to the prosecution, *Smith–Anthony*, 494 Mich. at 676, taking into consideration all reasonable inferences arising from the evidence, *Gonzalez*, 468 Mich at 640–641, resolving all conflicts in favor of the prosecution, *People v. Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008), and deferring to the jury's assessment of the weight of the evidence and the credibility of the witnesses, *Hardiman*, 466 Mich at 428, a rational trier of fact could have found sufficient circumstantial evidence, *Unger*, 278 Mich App at 231, to conclude that defendant intended to kill Davis.

(Mich. Ct. App. Op., ECF No. 1-6, PageID.105-106.)

Petitioner's only response to the court of appeals' analysis is to reiterate his court

of appeals' argument: "the only rational inference from the evidence presented was that, at most,

Mr. Willingham intended to scare Ms. Davis." (Pet'r's Appeal Br., ECF No. 1-2, PageID.62.)[1]  It may well be true that, construing the evidence in a light that favors Petitioner, the jury could have rationally inferred that he only intended to scare Ms. Davis.  That is not the standard.  The evidence identified by the court of appeals, viewed in a light that favors the prosecutor, certainly also supports the reasonable inference that Petitioner intended to kill Ms. Davis.  Therefore, the court of appeals determination that there was sufficient evidence to support the verdict that Petitioner was guilty of AWIM is neither contrary to, nor an unreasonable application of, *Jackson*.  Accordingly, Petitioner is not entitled to habeas relief.

### C.    Premeditation (habeas issue III)

Petitioner next contends that his sentence is invalid because the trial court erred in scoring the sentencing guidelines.  Offense variable 6 requires the trial court to assess 50 points if the offender had a premeditated intent to kill and 25 points if the offender had an unpremeditated intent to kill.  (Pet'r's Br., ECF No. 1-1, PageID.33.)  The trial court assessed 50 points for Petitioner.  Petitioner asserts that "[a]t most, the shooting emanated from a heated argument, which negates a finding of premeditation." (*Id.*, PageID.34.)  Petitioner's argument boils down to a claim that there was insufficient evidence of his premeditated intent to kill.

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Wilson*,

---

[1] The petition specifically refers the Court to Petitioner's court of appeals brief.  (Pet., ECF No. 1, PageID.6.)

562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Claims concerning the improper application of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief).

Nonetheless, a sentence challenge can rise to the level of a constitutional violation. For example, a sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980), *quoted in Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. 2005); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

The court of appeals explained the factual foundation for the scoring of offense variable 6 as follows:

> A jury's decision that a defendant had the requisite intent to kill for purposes of AWIM does not reach the issue of whether the intent was premeditated. *People v. Steanhouse*, 313 Mich App 1, 41; 880 NW2d 297 (2015), aff'd in part, rev'd in part on other grounds —— Mich —— (2017). "Premeditation, which requires sufficient

time to permit the defendant to take a second look, may be inferred from the circumstances surrounding the killing." *People v. Coy*, 243 Mich App 283, 315; 620 NW2d 888 (2000). "[B]ut the inferences must have support in the record and cannot be arrived at by mere speculation." *Steanhouse*, 313 Mich App at 41. Factors that may be considered in determining premeditation include "(1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id*. at 40-41 (citation and quotation marks omitted).

Evidence was presented that, in the days leading up to the shooting, Davis had been in a serious fight with defendant's sister. As a result, when Davis became aware of defendant's presence at J&B's, she attempted to leave. However, rather than letting Davis leave, defendant confronted her. Defendant was carrying a firearm when he approached Davis, and he discharged the firearm eight times in her direction, both of which support a finding of premeditation. See *Coy*, 243 Mich App at 315. Based on all the facts and circumstances, there was sufficient evidence to conclude that defendant acted with premeditation, and the trial court properly assessed 50 points for OV 6. *Hardy*, 494 Mich. at 438.

(Mich. Ct. App. Op., ECF No. 1-6, PageID.110-111.) Petitioner does not challenge as false any of the facts upon which the appellate court relied. Instead, he argues that the court of appeals should have concluded from other facts that his intent to kill was not premeditated. Petitioner's argument raises only a state law issue that is not cognizable on habeas review.

### D.      Fourth habitual offender (habeas issue IV)

Petitioner next claims his sentence as a fourth habitual offender was improper because he did not have three prior felonies. Petitioner notes that the trial court relied on: (1) a September 12, 2012, conviction in Dupage County, Illinois, for possession of marijuana; (2) a February 28, 2011, conviction in Dupage County for delivery of marijuana; and (3) a September 6, 2010, conviction in Dupage County for resisting a peace officer. There was some dispute as to whether the "resisting" offense would have been a felony in Michigan. The trial court resolved that dispute in favor of the prosecutor and, thereafter, Petitioner's other challenges to the predicate offenses were ignored.

In Petitioner's brief on appeal, counsel outlined the other challenges to the predicate felonies. Counsel indicated that he was never able to find a September 12, 2012, conviction for possession of marijuana. He found a September 15, 2010, guilty plea for possession of 2.5 grams or less of marijuana, which he argued was not to be counted because (1) the crime would be a misdemeanor in Michigan and (2) Petitioner did not have an attorney. He also found a December 10, 2010, guilty plea for possession of 2.5 to 10 grams of marijuana. That offense too, counsel argued, was a misdemeanor in Michigan. Finally, counsel was unable to find a February 28, 2011, conviction for delivery of marijuana. Instead, for that date, he found a guilty plea for possession of marijuana for which Petitioner was sentenced to 18 months in prison. Counsel indicated that conviction also should not count because no attorney was present. Petitioner, therefore, has identified a sufficient number of offenses; he simply claims they do not count because they are misdemeanors or because his pleas were entered without counsel.

The court of appeals resolved Petitioners challenges as follows:

> Defendant first argues that the trial court relied on a non-existent possession of marijuana conviction from September 12, 2012. A review of defendant's PSIR reveals, however, that on February 28, 2011 defendant pleaded to a charge of possessing 30 to 500 grams of marijuana, and that he was sentenced to 2 years' probation. That same charge indicates that, on September 12, 2012, defendant violated his probation and was subsequently sentenced to 18 months' imprisonment. There is no other reference to September 12, 2012 in defendant's PSIR. Therefore, it appears that, for habitual offender purposes, two of the listed felonies (possession of marijuana and a probation violation attendant to it) were actually one.

> Nonetheless, defendant's PSIR reveals a 2010 conviction for manufacture/delivery of marijuana, and subsequent 2010 and 2011 convictions for second-offense and third-offense possessions of marijuana. All of these convictions fit the definition of a "felony" under the Code of Criminal Procedure, as they were punishable by imprisonment for more than one year. See MCL 761.1(g); *People v. Smith*, 423 Mich 427, 445; 378 NW2d 384 (1985). And defendant admits on appeal that his conviction in Illinois for resisting and obstructing a police officer also fits this definition. Defendant thus was convicted of at least three prior felonies for purposes of the habitual offender statute, and any error was harmless. See *People v. McAllister*, 241 Mich App 466, 473; 616 NW2d 203, 207 (2000), remanded on

other grounds 465 Mich 884 (2001) ("However, when the alleged inaccuracies would have no determinative effect on the sentence, the court's failure to respond may be considered harmless error.").

(Mich. Ct. App. Op., ECF No. 1-6, PageID.111.)  Petitioner does not respond to the court of appeals determination.  Instead, he reiterates the argument from his direct appeal—the argument rejected by the court of appeals—that the other offenses would not count because they are misdemeanors or because pleas were entered without counsel.

"State courts' harmless-error determinations are adjudications on the merits, and therefore federal courts may grant habeas relief only where those determinations are objectively unreasonable.  *O'Neal v. Balcarcel*, 933 F.3d 618. 624 (6th Cir. 2019) (citing *Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015)).  Whether or not an offense is a felony and, thus, counted under the habitual offender statute is a matter of state law.  Here, the Michigan Court of Appeals concluded the three offenses were felonies under Michigan law.  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit recognizes "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). *See also Thomas v. Stephenson*, 898 F.3d 693,700 n.1 (6th Cir. 2018) (same).  Thus, this Court is bound by the state appellate court's determinations that the three offenses are felonies.

The state court did not specifically address Petitioner's contention that guilty pleas entered without counsel do not count.  The court appeared to simply ignore it.  Petitioner's contention that guilty pleas without counsel do not count is based on *People v. Crawford*, 296 N.W.2d 244 (Mich. Ct. App. 1980).  Petitioner misreads the holding of that case.  *Crawford* does not hold that convictions without counsel cannot be counted, it holds that convictions without counsel do not count if the defendant has not been advised of, and intelligently waived, his rights.

*Id*. at 245-46. Petitioner has not claimed that he was not advised of his rights or that he did not intelligently waive them. Accordingly, he offers no basis, under *Crawford*, to not count the offenses identified by the court of appeals. Indeed, clearly established federal law holds that "an uncounseled misdemeanor conviction, valid under *Scott* [*v. Illinois*, 440 U.S. 367 (1979),] because no prison term was imposed, is also valid when used to enhance a punishment at a subsequent conviction." *Nichols v. United States*, 511 U.S. 738, 749 (1994). Thus, Petitioner has offered no basis, and there appears to be no basis, to conclude that the appellate court's harmless error determination is unreasonable. Therefore, he is not entitled to habeas relief on this claim.

### E.    Admission of the gun (habeas issue V)

Petitioner's fifth habeas ground is taken from his *pro per* brief on appeal. In his appeal brief, he makes two distinct arguments in connection with the issue. First, he contends the trial court should not have admitted into evidence a firearm because the prosecution failed to prove that the particular firearm admitted was ever in his possession. Second, Petitioner argues that the prosecutor failed to prove the felony firearm charge.

The court of appeals focused its analysis on the second of Petitioner's challenges:

"The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v. Avant*, 235 Mich App. 499, 505; 597 NW2d 864 (1999). Defendant argues that there was insufficient evidence to prove that defendant had actual or constructive possession of the handgun that was admitted at trial. Defendant argues that the only evidence linking him to the handgun was the photograph of him holding it. However, Hemphill testified that defendant had a gun at J&B's and fired multiple rounds at Howard's car as he drove away with Davis. Ingersoll testified that Davis told him during their interview that defendant had fired at her as she was being driven away from J&B's in Howard's car. And Davis reported in her 911 call that defendant had fired a gun at her. Viewing this evidence in the light most favorable to the prosecution, *Smith-Anthony*, 494 Mich at 676, there was sufficient evidence for the jury to conclude that defendant possessed a firearm during the commission of the felony for which he was convicted.

(Mich. Ct. App. Op., ECF No. 1-6, PageID.112.)  As was the case with the premeditation issue, the court of appeals, as *Jackson* commands, reviewed the evidence against the elements of the crime in a light that favored the prosecutor.  The appellate court's conclusion is well-grounded in the record, as Petitioner has presented it, and consistent with, not contrary to, clearly established federal law.

The court of appeals did not directly address Petitioner's contention that the prosecutor did not sufficiently link the gun to him to make the gun admissible in his trial.  Nonetheless, the contention has not merit.  Petitioner ignores the fact-finder's power to make reasonable inferences.  Petitioner reports that Officer Benjamin Ingersoll testified that 8 spent shell casings were found in the BJ's parking lot.  (Pet., ECF No. 1-1, PageID.18.)  Petitioner reports that Detective Jonathan Wickwire testified that 4 of the 8 fired cartridges had been fired from the gun that was introduced at Petitioner's trial; the other 4 did not permit a conclusive determination of that issue.  (*Id.*, PageID.21.)  Petitioner reports that Officer Brian Smit testified that the gun was found during the search of a home where Petitioner's brother was arrested on an unrelated crime.  (*Id.*, PageID.20.)  Petitioner reports that Detective Wickwire testified that Petitioner acknowledged in two of the stories he told Wickwire that the gun was Petitioner's.  (*Id.*, PageID.21.)

Based on the testimony of Hemphill and Davis, the court or the jurors might reasonably infer that the casings found in BJ's parking lot were casings from the shooting the witnesses described.  According to Detective Wickwire, at least 4 of those casings were fired from the gun that was introduced into evidence at Petitioner's trial and Petitioner twice acknowledged to Wickwire that the gun was Petitioner's.  Although the admissibility to the gun is entirely a state law issue, any claim that no adequate foundation was laid for its admission is plainly meritless.

Petitioner has failed to demonstrate that the court of appeals rejection of his challenge to the felony firearm conviction is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## F. Ineffective assistance of counsel (habeas issues III, IV, and V)

In Petitioner's final three habeas issues, he offers the alternative claim that his trial counsel rendered ineffective assistance for failing to raise the claims. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of

*Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The court of appeals rejected Petitioner's ineffective assistance claim regarding guidelines scoring because "the trial court properly assessed 50 points for OV6 . . . [therefore] and objection would have been meritless." (Mich. Ct. App. Op., ECF No. 1-6, PageID.111.) The court of appeals rejected Petitioner's ineffective assistance claim regarding the habitual offender sentence enhancement because "any error was harmless . . . [therefore] there is not a reasonable probability that the outcome would have been different." (*Id.*, PageID.111-112.) Finally, the court of appeals rejected Petitioner's ineffective assistance claim regarding counsel's failure to move to suppress admission of the handgun "because any such objection would have been meritless." (*Id.*, PageID.112.)

"Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). The state court determinations that a guidelines scoring challenge has no merit and that a motion to suppress would have no merit are state court determinations of state law. Such determinations bind this Court, *see Stumpf*, 722 F.3d at 746 n.6, and, under *Coley*, dictate the result of Petitioner's ineffective assistance claims as well.

The court of appeals determination that any error regarding the habitual offender sentence enhancement was harmless also dictates the result of Petitioner's ineffective assistance claim arising from the enhancement—but for a different reason. The appellate court's decision that the error was harmless because it was not outcome determinative, a determination to which this Court must defer for the reasons stated above, is the equivalent of a determination that the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). *Kyles v. Whitley*, 514 U.S. 419, 435-436 (1995). The determination that any error was harmless under *Brecht* necessarily means that it is not prejudicial under *Strickland*. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (explaining that the *United States v. Agurs*, 427 U.S. 97 (1976), materiality standard, later adopted as the prejudice standard for ineffective assistance of counsel claims, requires the habeas petitioner to make a greater showing of harm than is necessary to overcome the harmless error test of *Brecht*); *see also Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016) ("[O]ur previous analysis of *Strickland* prejudice applies to the assessment of whether the Confrontation Clause violation was harmless error under *Brecht*."); *Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004) ("Because we find the error to be harmless [under *Brecht*] Bell cannot meet the prejudice requirement of *Strickland* . . . ."); *Kelly v. McKee*, No. 16-1572, 2017 WL 2831019 at *8 (6th Cir. Jan. 24, 2017) ("Because Kelly suffered harmless error [under *Brecht*] at best, he cannot establish that he suffered prejudice [under *Strickland*]."). Thus, once the Court defers to the determination that any error was not outcome determinative, it necessarily follows that Petitioner cannot establish prejudice under *Strickland* for counsel's failure to raise the issue.

For all of these reasons, Petitioner has failed to show that the court of appeals rejection of his ineffective assistance of counsel claims is contrary to, or an unreasonable application of, *Strickland*. Thus he is not entitled to habeas relief on those claims.

## IV.     Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.  Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

**<u>Conclusion</u>**

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:   December 4, 2019                    /s/ Paul L. Maloney
                                             Paul L. Maloney
                                             United States District Judge